**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**


**CARLOTTA E. MASSEY,**

      **Plaintiff,**

**vs.**                     **Case No.  5:12-CV-187-CAS**

**CAROLYN W. COLVIN,[1]**
**Acting Commissioner of Social Security,**


      **Defendant.**

_____/


## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by Chief United States

District Judge M. Casey Rodgers.  Doc. 10.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).

After careful consideration of the entire Record, the Court affirms the decision of the

Commissioner.

## I.  Procedural History of the Case

On July 16, 2008, Plaintiff, Carlotta E. Massey, filed a Title II application for a

period of disability and Disability Insurance Benefits (DIB), alleging disability beginning

December 25, 2005.  R. 11.  (Citations to the Record shall be by the symbol "R."

followed by a page number that appears in the lower right corner.)  Plaintiff's date last

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

insured, or the date by which her disability must have commenced in order to receive benefits under Title II, is March 31, 2006.  R. 11.

Plaintiff's application was denied initially on September 20, 2008, and upon reconsideration on January 9, 2009.  R. 11, 49-50.  On September 1, 2009, Plaintiff requested a hearing.  R. 11, 62-63.  On February 10, 2011, in Panama City, Florida, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Stephen C. Calvarese.  R. 11, 22-48.  Robert N. Strader, an impartial vocational expert, testified during the hearing.  R. 11, 45-47, 104.  (Resume).  Plaintiff was represented by David E. Evans, an attorney.  R. 11, 22, 24-25, 60-61.

On February 25, 2011, the ALJ issued a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled through March 31, 2006, the date last insured.  R. 17.  On March 22, 2011, Plaintiff requested review of this decision, which the Appeals Council denied on April 17, 2012.  R. 1-7.  The ALJ's decision stands as the final decision of the Commissioner.

On June 15, 2012, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 11 and 12, which have been considered.

## II.  Findings of the ALJ

In the written decision, the ALJ made several findings relative to the issues raised in this appeal:

1.  Plaintiff "last met the insured status requirements of the Social Security Act on March 31, 2006."  R. 13.

2.  Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of December 25, 2005 through her last date insured of March 31, 2006."  R. 13.

3. "Through the date last insured, [Plaintiff] had the following severe impairment: psychosis, not otherwise specified." R. 13.

4. "Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medially equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 13.

5. "[T]hrough the date last insured, [Plaintiff] had the residual functional capacity [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] was limited to simple, repetitive jobs that did not require the ability to remember and carry out detailed instructions, work in close proximity with others, or require more than superficial contact with the general public.  She could understand, remember, and carry out simple, routine, repetitive, instructions.  [Plaintiff] could perform well-learned tasks in a stable environment requiring only limited social contact with coworkers and the general public." R. 15.

6. "Through the date last insured, [Plaintiff] was capable of performing past relevant work as a housekeeper.  This work did not require the performance of work-related activities precluded by [Plaintiff's RFC]." R. 17.

7. Plaintiff was not under a disability at any time from December 25, 2005, the alleged onset date, through March 31, 2006, the date last insured.  R. 17.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision.  <u>Moore</u>, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); <i>see</i> 20 C.F.R. § 404.1509 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12

---

[2]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months. <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002). In addition, an individual is entitled

to DIB if she is under a disability prior to the expiration of her insured status. *See*

42 U.S.C. § 423(a)(1)(A) and (d); <u>Torres v. Sec'y of Health & Human Servs.</u>, 845 F.2d

1136, 1137-38 (1st Cir. 1988); <u>Cruz Rivera v. Sec'y of Health & Human Servs.</u>, 818

F.2d 96, 97 (1st Cir. 1986). 42 U.S.C. § 423(d)(1)(A)

> quite clearly requires that it is the impairment only which must last for a
> continuous period. Normally, of course, when a claimant has an impairment
> severe enough to prevent him from working, he will be unable to work for as long
> as the impairment lasts. This is particularly true when the impairment is physical.
> The statute, however, does not *require* that a claimant be unable to engage in
> work during the entire 12 month period. *See also* 20 C.F.R. §§ 404.1505(a);
> 404.1509; 404.1510. The ability of a claimant to engage in work for limited
> periods of time certainly calls into question the severity of the impairment, but it
> does not necessarily determine whether the impairment, however, severe, has
> lasted for at least 12 months.

> While a claimant need only show that an alleged impairment has lasted or can be
> expected to last for the 12 month period to meet the duration requirement, a
> claimant alleging a mental impairment may face a difficulty not presented in
> cases involving physical impairment. As one court has stated,

>> While the mere existence of symptom-free periods may negate a finding of
>> disability when a physical impairment is alleged, symptom-free intervals
>> do not necessarily compel such a finding when a mental disorder is the
>> basis of the claim. Unlike a physical impairment, it is extremely difficult to
>> predict the course of mental illness. Symptom-free intervals, though
>> sometimes indicative of a remission in the mental disorder, are generally
>> of uncertain duration and marked by an impending possibility of relapse.
>> Realistically, a person with a mental impairment may be unable to engage
>> in competitive employment, as his ability to work may be sporadically
>> interrupted by unforeseeable mental setbacks.

> *Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D. Cal. 1981).

> Because of such considerations, the courts which have considered the question
> have concluded that a claimant whose claim is based on a mental condition does
> not have to show a 12 month period of impairment unmarred by any symptom-
> free interval. . . . We agree with the assessment of these courts. A finding that a
> claimant has a mental impairment which manifests itself from time to time over a
> long-term period is not inconsistent with the language of the statute, which
> requires that an impairment last "for a continuous period of 12 months.". . . . Of

course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback.

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted).  *See also*

Lane v. Astrue, No. 1:09CV00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30

(N.D. Fla. July 28, 2010) (citing Singletary).

 The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

 1. Is the individual currently engaged in substantial gainful activity?

 2. Does the individual have any severe impairments?

 3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

 4. Does the individual have any impairments which prevent past relevant work?

 5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g).  If the

Commissioner carries this burden, the claimant must prove that he or she cannot

perform the work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007,

1011 (11th Cir. 1987).

## IV.  Legal Analysis

### A. Substantial evidence supports the ALJ's finding that Plaintiff had the RFC to perform a range of work, including her prior work as a housekeeper, at all exertional levels, but with several nonexertional limitations, prior to March 31, 2006.

Plaintiff argues the ALJ erred when he did not expressly consider the opinions of

Mark D. White, D.C., a chiropractor, who evaluated and treated Plaintiff from May 1998,

until May 21, 2009, for neck pain and headaches and other physical ailments.  Plaintiff

also argues the ALJ erred when considering Plaintiff's GAF scores and not expressly

considering other noted issues such as sensory seizures, kidney stones and mild

hydronephrosis, possible Tardive Dyskinesia, and others.  As a result, Plaintiff suggests

the ALJ further erred when he found Plaintiff could perform her past relevant work as a

housekeeper.  Doc. 11 at 8-11.  The Commissioner responds that none of Dr. White's

progress notes were "generated during the relevant period of December 31, 2005 to

March 31, 2006; that during the hearing, the ALJ discussed with Plaintiff her chiropractic

treatment; that the evidence from Dr. White is not relevant to Plaintiff's disability

determination; and that substantial evidence supports the ALJ's disability determination.

The Commissioner further argues that the ALJ properly considered Plaintiff's GAF

scores.  Doc. 12 at 6-15.

The ALJ determined that Plaintiff had one severe impairment: "psychosis, not

otherwise specified."  R. 13.  The ALJ concluded that Plaintiff's "medically determinable

mental impairment was severe in nature because it significantly limited [her] ability to perform basic activities for the period at issue." R. 13. The ALJ also found that Plaintiff's condition did not meet or equal one or more of the Listings. R. 13-15. This finding is based on the ALJ's consideration of four broad functional areas known as the "paragraph B" criteria. R. 13-15. These functional areas include activities of daily living, social functioning, concentration, persistence, or pace, and consideration of episodes of decomposition. The ALJ determined that Plaintiff had a *mild* restriction in activities of daily living, noting that Plaintiff did not have any significant difficulty in this area; *moderate* difficulties in social functioning, noting Plaintiff's ability to interact with the general public, work in close approximation with peers, and accept criticism from supervisors may have been moderately limited; *moderate* difficulties regarding concentration, persistence, or pace, noting that her ability to carry out detailed instruction and her ability to maintain concentration and attention may have been moderately limited, she could have been expected to understand, remember, and carry out simple one or two-step instruction  and perform better with learned tasks in a stable environment. R.14. The ALJ also found Plaintiff had *no* episodes of decompensation, which have been of extended duration. R. 14. Based on this analysis, the ALJ concluded that the paragraph B and C criteria of Listing 12.03 were not satisfied. R. 14. The ALJ recognized that these findings are not a RFC assessment, but are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. R.14.

The ALJ then determined Plaintiff's RFC by examining and briefly discussing the relevant evidence in the record. R. 15-17. The ALJ briefly discussed salient portions of

Plaintiff's hearing testimony, R. 16, and Plaintiff does not contend that the ALJ

overlooked material testimony from Plaintiff.  *See* Doc. 12.

The ALJ found Plaintiff had severe impairments that "could reasonably be

expected to cause the alleged symptoms."  The ALJ, however, did not find her

"statements concerning the intensity, persistence and limiting effects of these

symptoms" to be credible "to the extent they are inconsistent with the" ALJ's RFC

assessment, which is supported by substantial evidence.  R. 16.  The ALJ made several

observations and credibility findings in support of these conclusions.  R. 15-17.

Although the ALJ's findings are relatively brief when compared to the record as a whole,

the ALJ's findings are nonetheless supported by substantial evidence.  R. 16-17.

Relevant evidence in the record includes:

- On November 18, 2005, the month before her alleged onset date, when
  Plaintiff was not taking any medications, she was hospitalized for
  four days at Bay Medical Behavioral Health Center (Bay) due to an episode of
  psychosis with altered mental status and extreme agitation.  R. 205.
  A dose of Haldol had an immediate effect and Plaintiff calmed down.  Plaintiff
  "had no significant medical history," although she reported one prior episode
  without details.  R. 205, 215.  Her drug screen was positive for cannabinoids and
  her discharge diagnoses included psychotic disorder, NOS, rule out psychosis
  secondary to marijuana or other drug, and rule out other disorders.  R. 205, 209.
  Plaintiff, who had chiefly complained of being overstressed, R. 209, 215, was
  discharged to her home with instructions to seek treatment at Life Management
  Center.  R. 210.  No orthopedic abnormalities were reported.  R. 205.  The
  discharge physician prescribed Seroquel to be taken at bedtime and Levaquin for
  an infection.  Plaintiff's GAF score was 35 on admission and 55 when
  discharged.  R. 209-10, 216.  (The ALJ gave significant weight to the treating
  records of Bay covering November 18, 2005, through November 22, 2005.
  R. 16).[3]

---

[3]  The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the Global
Assessment of Functioning (GAF) Scale that is primarily used by mental health
practitioners.  The GAF Scale is used to report "the clinician's judgment of the
individual's overall level of functioning" (with regard to only psychological, social, and
occupational functioning) and "may be particularly useful in tracking the clinical
progress of individuals in global terms, using a single measure."  *See* DSM-IV-TR 32-

- On December 22, 2005, Plaintiff presented to Life Management Center Crisis Stabilization Unit (Life Management) due to symptoms of psychosis, but she experienced improvement after medications were administered. R. 283, 285. Upon discharge three days later, Plaintiff's GAF scale score had improved from 30 to 50. R. 283. In addition, the discharging psychiatrist, Tommy Swiney, D.O., noted that Plaintiff had been compliant with her medication, Geodon 60mg twice daily, and had improvement in her psychotic symptoms, no suicidal thoughts, no manic symptoms, normal concentration and memory, and good insight and judgment. R. 283. Dr. Swiney questioned whether the episode was secondary to sleep deprivation as opposed to being brief psychotic disorder vs. schizophrenia. R. 283. Dr. Swiney continued Geodon 60 mg twice daily. R. 283. (The ALJ gave significant weight to the treating records of Life Management covering December 22, 2005, through February 16, 2006. R. 17.).

- Plaintiff's subsequent treatment notes from Life Management show that she was compliant with Geodon and did not experience psychotic symptoms during the remainder of the relevant period. R. 281. At her first follow-up appointment on January 12, 2006, Plaintiff exhibited normal mental status examination findings, had no manic symptoms, had been doing well without psychotic symptoms, had no recent seizure activity despite a prior diagnosis of sensory seizures, and had no depressive symptoms, and Dr. Swiney assessed a

---

34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* *See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale). A GAF scale rating of 21-30 is indicative of behavior which is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. DSM-IV-TR at 34. A GAF scale rating of 31-40 is indicative of some impairment in realty testing or communication or major impairment in several areas, such as work or school family relations, judgment, thinking, or mood. *Id.* A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

GAF score of 60, which indicates moderate mental health symptoms or moderate difficulty in social, occupational, or school functioning.  R. 281-82; *see supra* n.3.

- On January 28, 2006, Plaintiff exhibited normal mental status examination Findings, R. 280, and Dr. Swiney assessed a GAF of 60 and reported that Plaintiff had been doing well with no psychotic symptoms or depressive symptoms.  R. 279.

- On February 17, 2006, Plaintiff's last evaluation during the period relevant to the disability determination, Dr. Swiney reported that Plaintiff "continues to [do] well in regards to psychotic symptoms and depressive symptoms."  R. 277.  Dr. Swiney stated that Plaintiff had "[n]o depressive symptoms such as decreased concentration, interest, energy and no suicidal ideation or thoughts of hopelessness."  R. 277.  Her medication compliance remained good and Dr. Swiney again assessed a GAF score of 60.  R. 277.

- Plaintiff continued treatment at Life Management from approximately April 27, 2006, until December 9, 2008.  R. 234-37, 239-41, 243-47, 249-52, 254-60, 262-76, 399-400.  Generally, the assessments were within normal limits and GAF scores were generally at 55, although some scores were at 50; and others at 60 on July 3, 2007, January 25, 2008, April 22, 2008, June 3, 2008, September 2, 2008; 65 on July 27 and October 23, 2007; and 80 on December 9, 2008, when Dr. Pollack noted that Plaintiff "reported no symptom return and no evidence of any side effects from her medication.  Had a chance to watch her interact with her grand-daughter and this went very well and normative."  R. 400.[4]

- After December 2008, Plaintiff's next visit at Life Management was on March 5, 2009, and Plaintiff was reported as stable with a GAF score of 60.  R. 517; *see* R. 514 (June 9, 2009); 511 (October 27, 2009); 508 (January 12, 2010-Plaintiff reported feeling okay, but at times heard someone calling her name, and that her husband thinks she spends too much time on the couch); 506 (April 7, 2010-Plaintiff noted as compliant and doing well); 504 (July 6, 2010).  On September 30, 2010, Plaintiff was asked to "quit Marijuana 100%, see a counselor, exercise for stress, etc."  Her GAF score was 51.  R. 501.  A January 27, 2011, note stated, in part, that Plaintiff's husband "want Pt to get up off couch and her kids are disrespectful.  They have not [sic] money.  She is trying for disability.  She quit Lexapro and Invega 2 months ago.  Is depressed, hears noises but, not command auditory hallucinations had in past.  Off Invega she got periods back."  R. 497.  Her GAF score was 50.  No report of substance use was noted.  R. 497.

---

[4]  On April 10, 2007, Plaintiff and her husband reported to Dr. Joseph that she was "developing slightly abnormal movement of her lower jaw of which she was not aware.  [He] told them that this may be the beginning of Tardive Dyskinesia."  R. 262.  By June 4, 2007, Dr. Joseph did not notice any abnormal jaw movements, R. 256; *see* R. 234, 240, 243, 246, 249, 251, 336.

- After Plaintiff filed her DIB application, Robert Schilling, Ph.D., P.C., and James L. Meyers, Psy.D., state agency psychological consultants, reviewed Plaintiff's file from the relevant period and completed separate psychiatric review techniques. R. 287-300 (September 9, 2008), 421-34 (January 8, 2009). Both concluded that during that time, Plaintiff's mental impairments caused only *mild* restriction in her daily activities; *moderate* difficulty in maintaining concentration, persistence, or pace; and *no* episodes of decompensation. R. 297, 299, 431, 433. Dr. Schilling determined that Plaintiff had *mild* difficulties in maintaining social functioning, whereas Dr. Meyers determined Plaintiff had *moderate* difficulties in social functioning. R. 297, 431. Both psychologists also completed mental RFC assessments. R. 391-94, 417-20. Both psychologists concluded that Plaintiff was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions and respond appropriately to workplace changes, and was no more than moderately limited in other areas. R. 391-93, 418-19. Both psychologists opined that Plaintiff could perform simple repetitive tasks, likely had the abilities to perform tasks at higher levels in spite of her moderate functional limitations, and could meet the basic mental demands of work. R. 393, 419. (The ALJ gave significant weight to the opinions of the consulting State agency psychologists. R. 17.).

- Plaintiff was born on June 20, 1968 and testified she was 42 years old on the date of the hearing, which made her a younger individual. R. 26, 107. She also completed high school. R. 26. Plaintiff testified that she stopped working in 2000 not due to any physical or mental impairment but, rather, because her work schedule as a bank teller conflicted with her child's daycare center's hours of operation and this was stressful for her. R. 16, 31-32. Plaintiff testified that, "[t]he bank was needing me to stay extra, and the daycare would close before that time." R. 32. Additionally, Plaintiff indicated on an SSA form completed in connection with her DIB application that she had several reasons that limit her ability to work but also stated that she stopped working on December 31, 2000, "to be a stay at home mom with my newborn." R. 129. And on a Work History Report, she indicated that her last job was "STAY AT HOME MOM" from 2001 to 2008, encompassing the relevant period, and listed duties of taking care of children, laundry, cooking, and cleaning. R. 141.

Plaintiff correctly notes that the ALJ did not refer in his decision to any patient notes from Plaintiff's treating chiropractor, Dr. White. Doc. 11 at 7-11. This failure does not warrant reversal, however.

Dr. White's patient notes begin with Plaintiff's visit on January 20, 1998, complaining of soreness in her neck. R. 493. Visits ensued, with continued complaints of neck pain, reports of leaving work, returning to work, and reports that Plaintiff's neck

is feeling better.  R. 488-92.  On February 12, 1998, Dr. White noted that Plaintiff recovered sufficiently to return to work on February 13, 1998.  R. 487.  On February 19, 1998, Dr. White recommended Plaintiff be excused from work until further notice with a note--"no floor stripping!."  R. 484.  A March 17, 1998, note stated that Plaintiff quit her job.  She was given a sheet of cervical exercises.  R. 482.  Plaintiff continued seeing Dr. White when it was noted on June 1, 1998, Plaintiff's neck soreness returned--she was playing tennis and heard a pop.  R. 477.  Plaintiff continued with Dr. White throughout 1998 and on November 30 and December 8, 1998, Plaintiff reported headaches, stiffness at the base of her skull.  R. 467-76.

Throughout 1999, Plaintiff continued treatment with Dr. White, complaining off and on of neck pain, with intermittent relief noted.  R. 456-66.  An August 25, 1999, note stated that Plaintiff had been working long hours and was adjusted by a chiropractor in Boca Raton.  R. 460.  On December 22, 1999, Plaintiff reported being pregnant and her neck very stiff.  R. 456.  In 2000, stiffness and some tenderness in Plaintiff's cervical area were noted as well as other issues such as tenderness at the base of her skull. R. 451-54.

Plaintiff had two visits in 2001, R. 450, with complaints of neck stiffness and headaches, although Plaintiff felt immediate relief from the latter after an adjustment. R. 450.  Plaintiff had no reported visits in 2002 and two visits in 2003 and no reported visits in 2004.  R. 448-50.

Plaintiff had one visit on June 14, 2005, and no other reported visits until July 25, 2007.  R. 447-48.  This is significant because, as noted by the Commissioner, none of

Dr. White's patient notes were generated during the relevant period of December 31, 2005, to March 31, 2006.

A March 17, 2008, note stated that Plaintiff needed an adjustment. R. 444-46; *see* R. 443 (April 4, 2008, note). Plaintiff returned on May 21, 2009, with neck pain noted and references to Plaintiff's medications. R. 442. A final note appears for May 21, 2009, with Plaintiff reporting that the nerves in her neck are pressured, close to feeling pinched, with pain radiating into her right hand. R. 441-42.

At the administrative hearing, the ALJ and Plaintiff discussed her chiropractic treatment. R. 43-44. Plaintiff testified that her sole physical restriction was "[m]y neck gets easily pinched." R. 43. She then testified that chiropractic adjustments helped this condition. R. 43. Upon questioning from the ALJ, Plaintiff confirmed that her chiropractor never suggested that she consult with a neurologist or neurosurgeon for surgery. Dr. White sold her a pillow that helps with her neck. R. 43-44.

Aside from some 1998 notes regarding Plaintiff's work status, Dr. White did not opine that Plaintiff was disabled or otherwise had any significant functional limitations. Further, during the hearing, Plaintiff's counsel affirmatively represented that there were no treating physician restrictions in the file.[5] Rather, counsel requested the ALJ to consider Plaintiff's GAF scores that were "pretty low when she was admitted." R. 47.[6]

---

[5] Plaintiff refers to other noted issues such as sensory seizures, kidney stones and mild hydronephrosis, possible Tardive Dyskinesia, and others, but does not refer to medical or other evidence that indicates any of these issues impacted Plaintiff's ability to work as a housekeeper. Doc. 11 at 2, 9, 10.

[6] Substantial evidence supports the ALJ's consideration of Plaintiff's GAF score during the relevant period. The ALJ noted that Plaintiff's GAF score was 60 on January 12, 2006, during Plaintiff's first follow-up examination with Dr. Swiney.

The ALJ's discussion of Dr. White's notes would not have affected the outcome of this disability determination because the patient notes do not support Plaintiff's claim that the ALJ should have imposed greater limitations in his RFC finding.

Consistent with the medical and other evidence, the ALJ found that Plaintiff had the RFC to perform a full range of work with exceptions noted. R. 15. The testimony of Mr. Strader, the vocational expert, supported the ALJ's determination that Plaintiff was not disabled.

Specifically, during the hearing, Mr. Strader described Plaintiff's past work. R. 45-46. The ALJ asked Mr. Strader a hypothetical question that set forth Plaintiff's limitations in a manner consistent with the ALJ's findings concerning Plaintiff's condition and functional limitations. R. 46-47. Mr. Strader testified that Plaintiff could perform her past relevant work as a housekeeper as that job is described in the DOT and as performed by Plaintiff. R. 17, 47. Ultimately, the ALJ determined, with the assistance of the vocational expert, that Plaintiff was able to perform her past relevant work as a housekeeper "as actually and generally performed" by Plaintiff. R. 17.

Substantial evidence supports the ALJ's decision and he appropriately followed controlling law.

---

R. 16, 277, 279-82. The GAF score of 60 at that time was consistent with later observations, particularly when Plaintiff was compliant with her medication. *See supra* at 9-12.

## V. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence and the ALJ correctly applied the law.  Accordingly, the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on March 1, 2013.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**